UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL CASE NO. 06-241 (GK) |
| | : | |
| v. | : | VIOLATIONS: 18 U.S.C. § 1349 |
| | : | (Conspiracy) |
| NATWAN E. LOGAN | : | |
| | : | **FILED** |
| Defendant. | : | AUG 2 2 2006 |
| | | NANCY MAYER WHITTINGTON, CLERK |
| | | U.S. DISTRICT COURT |

## STATEMENT OF OFFENSE

Pursuant to Rules 11 and 32(c) of the Federal Rules of Criminal Procedure and United States Sentencing Guidelines §6B1.4, the United States, through its undersigned counsel, and defendant Natwan E. Logan, advised by his undersigned counsel, Frederick Brynn, stipulate and agree that the following facts are true:

On May 5, 2004, defendant Logan called J.W. concerning a counterfeit check scheme. Following that conversation, on May 13, 2004, Logan introduced J.W. to M.N., an acquaintance Logan knew to be involved in cashing counterfeit checks. The three men crafted a plan in which J.W. agreed to produce counterfeit checks, and M.N. agreed to deposit and cash the checks at banks in Washington, D.C. and elsewhere. The three men agreed that they would split the proceeds from their counterfeit check scheme. In fact, at the time of this agreement, J.W. was cooperating with the FBI in an investigation, and the counterfeit checks later produced by J.W. all were from a fictitious company named Premier Services.

On June 3, 2004, J.W. produced three counterfeit checks; however, M.N.'s name was misspelled on the checks. M.N. nonetheless concluded that he could cash one of the checks in the amount of $1,985. On June 4, 2004, Logan, J.W., and M.N. traveled to a Chevy Chase bank

branch in Washington, D.C. and deposited the $1,985 check at an ATM machine. Because M.N. failed to properly prepare the deposit, Chevy Chase bank "red flagged" M.N.'s account. As a result, when M.N. a few days later attempted to deposit a $7,495 counterfeit check J.W. had produced, the account was not available and the counterfeit check could not be deposited.

Subsequently, in late June 2004, M.N. opened an account with SunTrust bank and made numerous efforts in Washington D.C. and Maryland, with the assistance of Logan and J.W., to deposit a $9480 counterfeit Premier Services check obtained from J.W. Because of problems in opening the account, however, this counterfeit check was not deposited.

Also in June 2004, Logan and M.N. created a counterfeit check in the amount of $300,000 using check stock they had obtained during the course of the conspiracy. The counterfeit check was drawn on the account of an insurance company identified by M.N. Logan advised M.N. that Logan had a "cousin" in Chicago, Illinois with contacts in Las Vegas, Nevada who could be used to deposit and cash the counterfeit check they created. Logan learned from his cousin, S.H., that the check should be made out to Dan's Cleaning Service and the check should be mailed to a specified address in Las Vegas. Logan express mailed the $300,000 counterfeit check to Las Vegas, where it was deposited at a Bank of America bank branch in Las Vegas on June 28, 2004. Because the account on which the counterfeit check was drawn did not have sufficient funds to cover the check, Logan and M.N. did not receive proceeds from the check, nor did their coconspirators. Logan and M.N. sent to A.R., an associate of S.H., three additional counterfeit checks they prepared in the amounts of $65,000, $5,000, and $5,000, however, these checks were not deposited in part because of a problem with the name used as the payee for the checks.

Between June 30, 2004 and July 20, 2004, Logan, J.W., and M.N. discussed plans to create and deposit a $15,000 counterfeit check. On July 20, 2004, J.W. and M.N. successfully deposited this check into a SunTrust bank branch ATM in Washington D.C. Thereafter, on July 24, 2004, Logan and J.W. discussed efforts they needed to make to obtain proceeds from the cashed counterfeit check from M.N. Both Logan and J.W. subsequently had conversations with M.N. concerning the proceeds; however, M.N withdrew the funds from the check and fled without providing any proceeds to Logan and J.W.

Once it was clear that M.N. was fleeing with the proceeds from the $15,000 counterfeit check, Logan suggested that he and J.W. could utilize Logan's cousin in Chicago and his contacts in Las Vegas to deposit and cash counterfeit checks. Logan informed J.W. that his cousin could handle large checks and further talked about the $300,000 counterfeit check Logan and M.N. recently had deposited in Las Vegas. In late August 2004, Logan introduced J.W. to S.H., Logan's Chicago cousin. In a series of telephone conversations, S.H informed Logan and J.W. that S.H. had access to an account in Las Vegas, Dan's Cleaning Service, that could be used to deposit large counterfeit checks. S.H. also indicated that he had a contact inside a Las Vegas branch of Bank of America who could help them facilitate a counterfeit check scheme.

As a result of these discussions, in November 2004, J.W. produced a $15,000 counterfeit Premier Services check payable to Dan's Cleaning Service and provided it to Logan in Washington, D.C., who in turn express mailed the counterfeit check to a Las Vegas address provided by S.H. With the assistance of D.M., the account holder for the Dan's Cleaning Service account and the person to whom the counterfeit check was express mailed, S.H.

deposited the $15,000 counterfeit check into a Dan's Cleaning Service account at Bank of America and later withdrew cashier's checks. On December 16, 2004, S.H. met with Logan and J.W. in Washington, D.C. to provide them with proceeds from the counterfeit check. During their conversation, S.H. explained that the proceeds were smaller than anticipated do to a need to make payments to a Bank of America employee as a result of problems with the $300,000 counterfeit check Logan, M.N., D.M. and S.H. had created and deposited in June.

In January 2005, Logan, S.H., J.W., and an undercover agent participated in a telephone conversation in which the proceeds from the $15,000 check were discussed. During the conversation, S.H. suggested to the undercover agent that S.H. and his people could handle counterfeit checks as large as $1,000,000 but nonetheless suggested that they try to deposit and cash a check in an amount around $500,000. Between January and March 2005, Logan, S.H., and J.W. participated in numerous telephone conversations in which they discussed plans for depositing a $500,000 counterfeit check in Las Vegas.

On March 1, 2005, Logan and J.W. traveled to Las Vegas to provide S.H. and D.M. with a $500,000 counterfeit check drawn on a Premier Services account. Later that evening, Logan and J.W. met with S.H. and D.M. to discuss plans the next day for depositing the counterfeit check. On March 2, 2005, Logan, J.W., S.H., and D.M. traveled to a Bank of America branch in Las Vegas to deposit the $500,000 counterfeit check provided by J.W. D.M. went inside the bank with the counterfeit check and attempted to deposit the check; however, according to D.M., a bank employee told D.M. that because of the size of the check, it would take 14 days to clear. D.M. as a result did not deposit the check but instead told J.W. that they should wire the funds instead. Thereafter, Logan and J.W. retrieved the counterfeit check and left the area

around the Las Vegas Bank of America branch.

Later on March 2, 2005, Logan was arrested in Las Vegas for his participation in the conspiracy. Logan in subsequent interviews provided FBI special agents with statements in which he admitted his role in the conspiracy.

The United States and defendant Logan agree that as a result of the conspiracy in which defendant Logan participated, the intended total loss amount resulting from this conspiracy is $923,960. The United States and defendant Logan further agree that as a result of the conspiracy in which defendant Logan participated, a total of $331,985 in counterfeit checks were actually deposited at Chevy Chase, SunTrust, and Bank of America bank branches, all of which have deposits insured by the Federal Deposit Insurance Corporation.

Defendant Logan admits that were this case to proceed to trial, the facts described above would establish beyond a reasonable doubt that: (1) there existed an agreement between himself and others to engage in bank fraud by depositing and cashing counterfeit checks, (2) defendant Logan joined the agreement and conspiracy knowing full well that the purpose of the agreement and conspiracy was to defraud financial institutions by improperly enriching himself and his coconspirators by depositing and cashing counterfeit checks, and (3) defendant Logan and his

coconspirators in an effort to further the goals of the agreement and conspiracy while it was on-going, engaged in the various acts described above.

                      Respectfully submitted,

                      KENNETH L. WAINSTEIN
                      UNITED STATES ATTORNEY
                      FOR THE DISTRICT OF COLUMBIA

By: _____
                      G. BRADLEY WEINSHEIMER
                      Assistant United States Attorney
                      Bar Number 431796
                      555 4th Street, N.W.,
                      Washington, D.C.  20530
                      (202) 514-6991

## DEFENDANT'S ACCEPTANCE

I have read every word of this Statement of Offense. Pursuant to Rules 11 and 32 (c) of the Federal Rules of Criminal Procedure and United States Sentencing Guidelines §6B1.4, and after consulting with my attorney, Frederick J. Brynn, I agree and stipulate to this Statement of Offense.

Date: 8-22-06

_____
NATWAN E. LOGAN
Defendant

I have discussed this Statement of Offense with my client Natwan E. Logan. I concur with his decision to stipulate to this Statement of Offense.

Date: 8-22-06

_____
FREDERICK J. BRYNN
Attorney for the Defendant