UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. CR-06-241 (GK) |
| | : | |
| NATWAN LOGAN, | : | |
| | : | |
| Defendant. | : | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | : | |

<u>GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING</u>

The United States, by and through its attorney, the United States Attorney for the District of Columbia, submits this memorandum in aid of sentencing. For the reasons set forth below, the government respectfully recommends that the Court sentence defendant Logan to a period of incarceration at the low end of the applicable guideline range.

I.    <u>BACKGROUND</u>

<u>The Conspiracy</u>

On August 22, 2006, defendant Logan entered a pre-indictment guilty plea to a one-count Information charging conspiracy to commit bank fraud, in violation of Title 18 United States Code Section 1349. During his plea colloquy, defendant admitted that from May 2004 through March 2005, he and his coconspirators were responsible for creating, passing or attempting to pass numerous counterfeit checks at financial institutions in the District of Columbia, Maryland, and Las Vegas, Nevada. Defendant Logan, a former Metropolitan Police Department officer, participated in this fraud scheme primarily by introducing someone whom Logan believed could obtain counterfeit checks to other coconspirators whom Logan believed had the ability to cash the counterfeit checks. Defendant Logan participated further by assisting in drafting some of the

counterfeit checks and by receiving some of the counterfeit checks himself and express mailing them to coconspirators in Las Vegas. Finally, defendant Logan was present when some of the counterfeit checks were deposited or attempted to be deposited.

Specifically, defendant Logan acknowledged participating in a scheme to deposit and cash the following checks:

| CHECK AMOUNT | DATE OF DEPOSIT | PLACE OF DEPOSIT |
| --- | --- | --- |
| $  1,985 | June 5, 2004 | Chevy Chase Bank, D.C. |
| $  7,495 | June 8, 2004 (attempt deposit) | Chevy Chase Bank, D.C. |
| $  9,480 | June 22-30, 2004 (attempt deposit) | SunTrust Bank, D.C. / MD |
| $300,000 | June 28, 2004 | Bank of America, Las Vegas, NV |
| $ 15,000 | July 20, 2004 | SunTrust Bank, D.C. |
| $ 15,000 | December 1, 2004 | Bank of America, Las Vegas, NV |
| $500,000 | March 2, 2005 (attempt deposit) | Bank of America, Las Vegas, NV |

Three additional checks, in the amounts of $65,000, $5,000, and $5,000 were prepared by defendant Logan and a coconspirator and were sent to another coconspirator in Las Vegas; however, no effort ever was made to deposit these checks.

Despite their efforts, the coconspirators received proceeds from just two checks: the $15,000 check deposited and cashed in Washington, D.C. and the $15,000 check deposited and cashed in Las Vegas. Like most of the checks involved in this conspiracy, these were checks provided by a cooperating witness drawn on the account of a fictitious company created by the FBI. As to the first $15,000 check, a coconspirator fled with the proceeds and thus defendant Logan received nothing for this check. As to the $15,000 Las Vegas check, defendant Logan received approximately $1,500, another coconspirator received $2,500, and the remainder was retained by coconspirators who deposited and cashed the check in Las Vegas. With respect to the remainder of the checks, either unsuccessful attempts were made to deposit the checks in the

first place (i.e., checks in the amounts of $500,000, $7,495 and $9,480), or despite their efforts, the coconspirators received no proceeds from the deposited counterfeit checks (i.e., checks in the amounts of $300,000 and $1,985).

With respect to the $500,000 counterfeit check, for example, defendant Logan and coconspirators traveled to a Bank of America branch in Las Vegas to deposit the $500,000 counterfeit check. A coconspirator went inside the bank with the counterfeit check and attempted to deposit the check; however, a bank employee apparently told the coconspirator that because of the size of the check, it would take 14 days to clear. The coconspirators as a result did not deposit the check but instead concluded that they should wire the funds instead. Because the funds in reality were being provided by the FBI in an undercover capacity, no efforts were made to actually wire the check, although coconspirators did discuss further plans to do so. Similarly, with respect to the $300,000 counterfeit check (drawn not on the account of the FBI but on the account of a private insurance company), although the check was successfully deposited in Las Vegas, no proceeds were obtained from the check because the account on which the check was drawn did not have sufficient funds to cover the check.

As a result of the conspiracy in which defendant Logan participated, the intended total loss amount resulting from this conspiracy is $923,960. That is, the total amount of counterfeit checks the coconspirators created with the intent to deposit is $923,960. A total of $331,985 in counterfeit checks was actually deposited at Chevy Chase, SunTrust, and Bank of America bank branches, all of which have deposits insured by the Federal Deposit Insurance Corporation. The actual monetary loss as a result of the scheme is $30,000, all funds paid by the FBI through the

fictitious account created as part of the FBI's investigation. The total amount of proceeds obtained by defendant Logan is approximately $1,500.

<u>**Post-Arrest Assistance and Acceptance of Responsibility**</u>

Following the failed attempt to deposit the $500,000 counterfeit check in Las Vegas, defendant Logan was placed under arrest by the FBI while defendant Logan still was in Las Vegas. In subsequent interviews, defendant Logan admitted his role in the offense and further described the nature and extent of the conspiracy. Indeed, within approximately one week, Logan assisted law enforcement by making a recorded phone call to a coconspirator concerning further plans to wire the $500,000 check. Defendant Logan also described other efforts he was willing to make to assist law enforcement in the investigation of public corruption; however, those efforts ended when Logan began to tell others that he was assisting law enforcement as a cooperating witness. Defendant Logan subsequently resigned from the Metropolitan Police Department in 2006. Defendant Logan has remained cooperative in the investigation and prosecution of the bank fraud conspiracy in which he participated, entered a pre-indictment plea agreement, and has fulfilled the terms of his plea agreement.

## II.  <u>SENTENCING STANDARDS</u>

In <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Supreme Court held that the Sixth Amendment, as construed in <u>Blakely v. Washington</u>, 532 U.S. 296 (2004), applies to the federal Sentencing Guidelines. Accordingly, the Supreme Court "imposed a global remedy for the Sixth Amendment difficulties with the Sentencing Guidelines, invalidating their mandatory application and instead requiring district courts to consult them in an advisory fashion." <u>United States v. Labastida-Segura</u>, 396 F.3d 1140, 1142 (10th Cir. 2005). Thus, the sentencing court must fashion

a reasonable sentence guided by the factors specified in 18 U.S.C. Section 3553(a), including

correct application of the sentencing guidelines.  United States v. Price, 409 F.3d 436, 442-443

(D.C. Cir. 2005).  Although the sentencing judge also must weigh the other factors enunciated in

18 U.S.C. § 3553(a), "it is important to bear in mind that Booker/Fanfan and section 3553(a) do

more than render the Guidelines a body of casual advice to be consulted or overlooked at the

whim of a sentencing judge."  United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005).

Indeed, the "failure to follow the strictures of the guidelines is among the errors that might cause

a sentence to be overturned on appeal" as unreasonable.  Price, 409 F.3d at 442-443 (D.C. Cir.

2005).

      Courts have noted that "Booker requires judges to engage in a two-step analysis to

determine a reasonable sentence."  United States v. Doe, 412 F. Supp.2d. 87, 90 (D.D.C. 2006).

This process has been described as follows:

> [A] district court shall first calculate (after making the appropriate findings of
> fact) the range prescribed by the guidelines.  Then, the court shall consider that
> range as well as other relevant factors set forth in the guidelines and those factors
> set forth in [18 U.S.C.] § 3553(a) before imposing the sentence.

Id. (quoting United States v. Hughes, 401 F.3d 540, 546 (4th Cir. 2005)).  Following numerous

other Circuits that have addressed the issue, the D.C. Circuit has concluded that "a sentence

within a properly calculated guidelines range is entitled to a rebuttable presumption of

reasonableness."  United States v. Dorcely, 454 F.3d 366, 377 (D.C. Cir. 2006).[1]  As for the

---

[1]  See United States v. Smith, 440 F.3d 704, 707 (5th Cir. 2006); United States v. Kristl, 437
F.3d 1050, 1054 (10th Cir. 2006); United States v. Williams, 436 F.3d 706, 708 (6th Cir. 2006);
United States v. Green, 436 F.3d 449, 457 (4th Cir. 2006); United States v. Mykytiuk, 415 F.3d
606, 608 (7th Cir. 2005); United States v. Lincoln, 413 F.2d 716, 717 (8th Cir.), cert. denied, 126
S. Ct. 840 (2005).  See also United States v. Cooper, 437 F.3d 324, 330-31 (3rd Cir. 2006)

second step of the <u>Booker</u> sentencing analysis, the court in imposing sentence must as well

consider the other factors of Section 3553(a):

> These factors include, among others, the nature of the offense, the defendant's
> history, the need for the sentence to promote adequate deterrence and to provide
> the defendant with needed educational or vocational training, any pertinent policy
> statements issued by the Sentencing Commission, the need to avoid unwarranted
> sentencing disparities among similarly situated defendants, and the need to
> provide restitution to any victims.  *See* <u>18 U.S.C. § 3553(a) (2000)</u> (amended
> 2003).

<u>Price</u>, 409 F.3d  at 442 (D.C. Cir. 2005).

## III.    <u>SENTENCING CALCULATION AND RECOMMENDATION</u>

### <u>Sentencing Guidelines calculation</u>

The government has no objection to the guideline calculation presented in the

presentence report.  This calculation, an offense level of 16 and criminal history category of I,

results in a zone D range of imprisonment of 21 to 27 months.  This calculation also is consistent

with the calculation agreed to by the parties in the plea agreement.

Paragraph 78 of the presentence report correctly notes that the intended loss in this case is

$923,960 but appears to suggest that the parties agreed to a lesser intended loss calculation

resulting in a lower loss adjustment to the base offense level (12 level increase for a loss of

$331,985, as opposed to a 14 level increase for a loss of $923,960).  Indeed, the initial draft

presentence report calculated the offense level at 18, relying on a 14 level increase for loss

amount.  The government believes that $331,985 is the correct loss amount not because it

---

("While we review for reasonableness whether a sentence lies within or outside the applicable
guidelines range . . . it is less likely that a within-guidelines sentence, as opposed to an outside
guidelines sentence, will be unreasonable.").

represents the intended loss but because it represents the relevant loss amount under the applicable guideline calculation.

As the government explained more fully in its objections to the draft presentence report, USSG §2X1.1(b)(2) applies in making the applicable loss calculation because the coconspirators did not complete all of the acts they believed necessary for successful completion of the substantive offense. See USSG §2X1.1(b)(2), comment. (n. 4) (explaining how to calculate partially completed theft and fraud schemes); USSG §2B1.1, comment. (n. 17) (same); Mancuso v. United States, 42 F.3d 836, 849-850 (4th Cir. 1994) (applying USSG §2X1.1(b)(2) in a partially completed bank fraud scheme dealing with fraudulent checks). The coconspirators did complete all of the acts necessary to successfully complete bank fraud in the amount of $331,985, as indicated in the statement of offense and the plea agreement. Accordingly, the appropriate loss adjustment is a 12 level increase to the base offense level. The final presentence report agrees with this calculation.

## Sentencing Recommendation

### A.    Sentencing Factors Justify the Recommended Sentence

Based upon a guideline offense level of 16 and an applicable imprisonment range of 21-27 months, the government recommends a sentence at the low end of the guideline range. Applying all of the factors of 18 U.S.C., §3553(a), we believe this would be both an appropriate and reasonable sentence.

Taking into consideration the nature and seriousness of the offense and mindful of the need to fashion a sentence which promotes deterrence and a just punishment, the government believes that a sentence at the low end of the applicable guideline range is appropriate.

Defendant Logan was a public official in that he was an officer with the Metropolitan Police Department, and while he did not use his position as a police officer to further the counterfeit check scheme, he more than anyone should have realized the error in the choice he made to engage in criminal conduct. The type of fraud scheme in which defendant Logan engaged potentially costs hard working members of our community millions of dollars in stolen assets, resources dedicated to resolving and investigating problems associated with fraud, fees, and other costs passed onto customers by victim businesses. Certainly a police officer should realize the harm to society of engaging in the broad and flagrant fraud scheme in which defendant Logan was engaged.

Those who engage in the type of fraud scheme in which defendant Logan participated must realize that punishment in the form of incarceration will be meted out once their fraud scheme is uncovered. This is not a case where just one counterfeit check was deposited nor where the amounts that were subject of the fraud scheme are small. Defendant Logan participated in the creation and attempts to deposit numerous counterfeit checks for substantial amounts at three different financial institutions in three different jurisdictions. A sentence at the low end of the applicable guideline would send a strong message that those who engage in this sort of fraud scheme should think twice, given the prospect of imprisonment. This is true even more so for public officials like defendant Logan. While he did not use his position to further the scheme, he did engage in planning and carrying out the scheme while on duty. Indeed, defendant Logan was on duty when he received, discussed, and made arrangement to send to Las Vegas the $15,000 counterfeit check from which he ultimately received proceeds. These circumstances further justify the recommended sentence.

While it is true that defendant Logan has a long job history, has strong family ties, is active in the community, and has shown remorse and has accepted responsibility, these factors do not suggest that he should be given a break and an opportunity at further leniency beyond that afforded in a sentence at the low end of the applicable guideline. It may be that these factors, coupled with his education and vocational training, suggest defendant Logan is less of a risk for recidivism than other defendants. The nature and seriousness of the offense, together with defendant's position as a police officer, nonetheless demand a significant period of incarceration in this case. In making its recommendation, the government is mindful that defendant Logan has entered an early plea, has assisted in the investigation of the conspiracy, has accepted responsibility for his conduct, and has shown remorse. Because of these circumstances, the government agrees that it is appropriate for defendant Logan to receive the three level reduction in offense level for acceptance of responsibility. This reduction already has been calculated in the final offense level of 16. This reduction more than adequately adjusts defendant Logan's sentence for his assistance, remorse, and overall acceptance of responsibility.

An important factor of 18 U.S.C. §3553(a) that the court must consider in fashioning an appropriate sentence is treating similarly situated offends similarly. From this perspective, the guidelines range, while advisory, provides reasonable assurance that defendant Logan will be treated fairly when compared to similar offenders. The goal of the Sentencing Guidelines is to "move the sentencing system in the direction of increased uniformity… [so that] offenders who engage in similar real conduct would receive similar sentences." U.S. v. Booker, 543 U.S. at 254-255 (2005). The Supreme Court in Booker further noted that the Guidelines are an important tool Congress intended for the courts to use in achieving uniformity in sentencing.

Defendant Logan simply is unable to point to any exceptional circumstance that warrant a sentence below the "heartland" the Sentencing Guidelines are intended to capture.  See USSG Ch 1, Pt A, comment 4(b) (defining the "heartland" as "a set of typical cases embodying the conduct that each guideline describes," and noting that "[w]hen a court finds an atypical case… the court may consider whether a departure is warranted").

With respect to restitution, the presentence report notes that restitution is not an issue because the loss to the FBI is the routine costs associated with the investigation.  In this case, however, defendant Logan did receive approximately $1,500 in proceeds from one of the $15,000 checks, and he ought not be permitted to keep these illegally obtained funds.  Defendant Logan should be ordered to pay this amount in restitution to the United States or alternatively should be ordered to pay a $1,500 fine.

**B.      Defendant Logan is Not Entitled to a Sentence Outside the Guidelines**

To the extent defendant Logan seeks a probationary sentence or one below the applicable guideline range, such a sentence would be inappropriate in this case.  Under the Sentencing Guidelines, the defendant's sentencing range falls in Zone D of the Sentencing Table, which requires that "the minimum term. . . be satisfied by a sentence of imprisonment." USSG Ch. 5, Pt. C1.1(f). The official commentary to this section states that when the sentencing guideline range is in Zone D, imprisonment substitutes (such as probation or community service) are not appropriate. See USSG Ch. 5, Pt. C1.1(f), comment. 8.

Of course in weighing the factors of 18 U.S.C. §3553(a), the court must consider what weight to give the Sentencing Guidelines.  In doing so, the Court should consider whether or not defendant Logan's arguments and basis for imposing a sentence outside the applicable guideline

already is contemplated within the structure of the Sentencing Guidelines. Accordingly, the fact

that the defendant accepted responsibility for his crime by entering a plea of guilty and the fact

that the defendant does not have a criminal record should not be considered as a basis for a

sentence beneath the guideline range.  These factors already are considered by the Sentencing

Guidelines in determining the defendant's sentencing range. Computation of the defendant's

sentencing range reflects his early plea of guilty, pursuant to USSG Ch. 3, Pt. E1.1, and his lack

of criminal history, pursuant to USSG Ch. 4, Pt. A1.1. See U.S. v. Dyce, 91 F.3d 1462, 1469

(D.C. Cir. 1996) (noting that "Criminal History Category I is set for a first offender . . .

[t]herefore, a departure below the lower limit of the guideline range for Criminal History

Category I on the basis of the adequacy of criminal history cannot be appropriate," and

recognizing that a defendant's "remorse/full explanation" is likewise considered in computing

the guideline range, so "a further reduction is prohibited for an acceptance of responsibility").

    Similarly, despite that defendant Logan may claim he has important responsibilities to his

family and to his child in particular, the Sentencing Guidelines state that family ties and

responsibilities "are not ordinarily relevant in determining whether a departure may be

warranted." USSG §5H1.6 (policy statement). Factors such as family circumstances are relevant

in departure determinations only in "exceptional cases." USSG Ch. 5, Pt. H, intro. comment. As

a result, family ties and responsibilities are characterized as "discouraged" departure factors.

Koon v. U.S., 518 U.S 81, 95 (1996); see also U.S. v. Tucker, 386 F.3d 273, 277 (D.C. Cir.

2004) (recognizing that "family responsibilities" are a "rare, but permitted," ground for

departure).

To the extent the defendant Logan claims his criminal activity was as a result of a gambling addiction, the Guidelines could not be clearer: "[a]ddiction to gambling is not a reason for a downward departure." USSG §5H1.4; see also USSG §5K2.0(d) (1) (further emphasizing that gambling may not be used as the basis for a departure in combination with permissible grounds for departure). It simply is all too common that those who commit financial crimes claim a need for the money they attempt to obtain illegally, and this ground does not distinguish one offender from another.

Defendant Logan is entitled to no additional mercy because of a gambling problem or because he quite recently has taken steps to deal with the problem through counseling. While the government agrees that it is commendable that defendant Logan apparently now is in treatment for a gambling problem, his efforts are too little and too late. Having already engaged in criminal conduct, having been caught by law enforcement, and now facing punishment from the Court, defendant Logan can not enroll himself in a gambling counseling program and expect that these efforts will have any real impact on the appropriate and reasonable sentence in this case.

In sum, the Sentencing Guidelines help to assure that similarly situated offenders are treated similarly, and defendant Logan is unable to point to any exceptional circumstances that would persuade the Court that a sentence outside the Guidelines is appropriate and reasonable in this case. To the contrary, a sentence at the low end of the applicable guideline range would be a reasonable sentence in that it takes into account defendant Logan's acceptance of responsibility but also would provide just punishment and deterrence and appropriately takes into consideration the nature and seriousness of the offense, as well as defendant Logan's position as a police officer.

IV.     **CONCLUSION**

Wherefore, the government respectfully requests that the Court sentence the defendant to

a term of incarceration at the low end of the applicable guideline range.


Respectfully submitted,
JEFFREY A. TAYLOR
UNITED STATES ATTORNEY


/S/
_____
G. BRADLEY WEINSHEIMER
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-6991
Bar Number 431796